UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HOUSING & REDEVELOPMENT INSURANCE EXCHANGE, | |
| Petitioner, | CIVIL ACTION NO. 3:22-cv-01565 |
| v. | (SAPORITO, J.) |
| SCOTT TURNER,[1] Secretary of the United States Department of Housing and Urban Development, | |
| Respondent. | |

MEMORANDUM

This is a petition for judicial review of a federal agency administrative adjudication.

I. BACKGROUND

The petitioner, Housing & Redevelopment Insurance Exchange ("HARIE") is a reciprocal insurance exchange, an unincorporated non-profit insurance entity organized under Pennsylvania state law. It was originally established in 1985 by a consortium of public housing

---

[1] Scott Turner was confirmed by the United States Senate on February 5, 2025, to serve as Secretary of the U.S. Department of Housing and Urban Development. He has been automatically substituted in place of the original defendant, Marcia Fudge. *See* Fed. R. Civ. P. 25(d). The caption in this case is amended to reflect this change.

authorities ("PHAs") to pool their resources and insure each other's risks, presumably for lower premiums than available from outside insurers. Beginning in 1995, HARIE began underwriting insurance for non-PHA municipalities and their political subdivisions as well (e.g., water or sewer authorities, school districts). Its membership now includes approximately 400 municipal entities. Based on preliminary injunction motion papers filed in this case, about half of HARIE's insurance policies are issued to PHAs currently.

The respondent is the United States Department of Housing and Urban Development ("HUD"), a cabinet-level federal agency responsible for national policy and programs addressing the nation's housing needs. Under federal statutes and regulations, certain HUD programs are administered by PHAs. A standard contract (an "Annual Contributions Contract") between HUD and each of these PHAs requires the PHAs to maintain certain insurance coverages. Usually, the required insurance must be obtained through open and competitive bidding. But such bidding is not required if the PHA purchases insurance from a HUD-approved nonprofit insurance entity owned and controlled by PHAs, referred to as a Qualified PHA-Owned Insurance Entity ("QPIE").

In September 2021, HUD provided notice to HARIE of its intent to revoke HARIE's approval as a QPIE pursuant to 24 C.F.R. § 965.205.[2] HARIE requested an administrative hearing and discovery was exchanged. HUD filed an administrative complaint setting forth two bases for revoking HARIE's approval as a QPIE: (1) HARIE was not exclusively owned and controlled by PHAs (Count 1); and (2) HARIE did not limit participation in its insurance programs to PHAs (Count 2).

On April 26, 2022, an administrative law judge (the "ALJ") found that a genuine dispute of material fact existed with respect to ownership and control of HARIE, precluding summary judgment on Count 1, but that, based on the undisputed facts, HUD was entitled to judgment as a matter of law on Count 2, as HARIE undisputedly *did not* limit participation in its insurance programs to PHAs. The ALJ's decision was upheld on administrative review, and HARIE filed the instant petition for judicial review.

---

[2] This was apparently the third such notice provided to HARIE over the years. HUD provided a similar notice to HARIE in October 2000, with that action subsequently being withdrawn, and in September 2018, but a requested hearing in that proceeding does not appear to have ever been scheduled.

## II. DISCUSSION

The respondent has moved to dismiss this action, and the parties have briefed the motion and appeared for oral argument before the court. The issue before us is whether the HUD regulation limiting participation to PHAs only, 24 C.F.R. § 965.205(c), exceeds the scope of the authority granted to the agency by the relevant statute it purportedly implements, 42 U.S.C. § 1436c. HARIE argues that the implementing regulation goes beyond the terms of the statute, imposing an additional substantive requirement that, to qualify as a QPIE, an insurance entity must limit participation in its insurance programs to PHAs only, when the statute itself states only that the insurance entity must be "owned and controlled" by PHAs. The respondent, on the other hand, argues that the language of the statute is unambiguous, that the natural and necessary reading of the phrase "owned and controlled" is that, to qualify as a QPIE, an insurance entity must be *exclusively* owned and controlled by PHAs, and thus that a self-funded insurance entity may not permit non-PHAs to participate in its insurance programs. In the alternative, the respondent contends that the agency regulation prohibiting participation by non-PHAs is a valid exercise of authority delegated to it by Congress

to establish standards for approval of QPIEs under 42 U.S.C. § 1436c, or the authority more generally delegated to it by Congress to "fill up the details" of the statutory scheme under 42 U.S.C. § 3535(d).

Judicial review of HUD's determination of HARIE's eligibility for QPIE status is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq. See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) ("In addition to prescribing procedures for agency action, the APA delineates the basic contours of judicial review of such action."). In relevant part, the APA provides that:

> The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . .

5 U.S.C. § 706(2)(A), (C). Although the APA mandates that judicial review of policymaking and factfinding be deferential to the agency findings, *see, e.g.*, § 706(2)(A) (agency action shall be set aside if "arbitrary, capricious, [or] an abuse of discretion"); § 706(2)(E) (agency factfinding in formal proceedings shall be set aside if "unsupported by substantial evidence"), agency interpretations of statutes are *not* entitled to deference. *See Loper Bright*, 603 U.S. at 392. "Under the APA, it . . . remains the responsibility

of the court to decide whether the law means what the agency says." *Id.* (internal quotation marks omitted); *cf. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."), *overruled by Loper Bright*, 603 U.S. 369.

Thus, we begin our statutory analysis by examining the plain language of the statute. *See B & G Constr. Co. v. Dir., Off. of Workers' Comp. Programs*, 662 F.3d 233, 248 (3d Cir. 2011); *see also Da Silva v. Attorney Gen. U.S.*, 948 F.3d 629, 635 (3d Cir. 2020) ("In determining whether language is unambiguous, we read the statute in its ordinary and natural sense.") (internal quotation marks omitted). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). "[W]hen interpreting a statute, we strive to give effect to every word which Congress used and to avoid any interpretation which renders an element of the statute superfluous." *B & G Constr. Co.*, 662 F.3d at 248–49. "Where we find that the statutory language has a

clear meaning, we need not look further." *Marshak v. Treadwell*, 240 F.3d 184, 192 (3d Cir. 2001) (citing *Robinson*, 519 U.S. at 340); *see also B & G Constr. Co.*, 662 F.3d at 248 ("Where the statutory language is plain and unambiguous we rarely need to inquire into the meaning of the statute beyond examining its wording.").

The ALJ granted summary judgment in favor of HUD on Count 2 of the complaint, finding that HARIE had not limited participation in its insurance programs to PHAs only, but rather permitted non-PHA municipalities and their political subdivisions to participate, in violation of the agency's regulatory requirements for QPIE eligibility. The relevant regulation provides that: "HUD will approve a nonprofit self-funded insurance entity created by PHAs that limits participation to PHAs (and to nonprofit entities associated with PHAs that engage in activities or perform functions only for housing authorities or housing authority residents)."[3] 24 C.F.R. § 965.205(c).

---

[3] The regulation permitted participation by certain non-PHA nonprofit entities, but only if they provided services to housing authorities or housing authority residents exclusively, such as a child care center, a resident management corporation, or a food service organization, *see Financial Standards for Housing Authority-Owned Insurance Entities*, 58 Fed. Reg. 51952, 51953 (Oct. 5, 1993) (codified at
*(continued on next page)*

HARIE contends that this regulation exceeds the scope of the authority granted to the agency by the relevant statute it purportedly implements, which provides that: "[N]otwithstanding any other provision of State or Federal law, regulation or other requirement, any public housing agency . . . that purchases any line of insurance from a nonprofit insurance entity owned and controlled by public housing agencies . . . , and approved by the Secretary, may purchase such insurance without regard to competitive procurement." 42 U.S.C. § 1436c.

We begin with the plain language of the statute. On its face, it clearly does not prescribe any limitations with respect to participation in the prospective QPIE's insurance programs. HUD argues that the

---

24 C.F.R. § 965.205(c)) (responding to a public comment providing these examples), or even its own police department, *see Jeannot v. Phila. Hous. Auth.*, 356 F. Supp. 3d 440, 445 (E.D. Pa. 2018) ("The [Philadelphia] Housing Authority manages and operates a police department commonly known as the 'Philadelphia Housing Authority Police Department.'"). Although HARIE makes a frankly puzzling argument that its non-PHA municipal members fit within this language of the regulation, it is beyond dispute that these non-PHA members provide municipal services to the general public, and that they are not "nonprofit entities associated with PHAs that engage in activities or perform functions *only* for housing authorities or housing authority residents." 24 C.F.R. § 965.205(c) (emphasis added). For ease of reference, we will refer only to participation by PHAs and non-PHAs. Per our conclusions below, this particular distinction is immaterial.

regulation's "participation" limitation stems from the statute's express requirement that a QPIE be "owned and controlled" by PHAs. The term "owned and controlled" is not itself defined in the statute, but HUD argues that the natural and necessary reading of the phrase is that a QPIE must be *exclusively* owned and controlled by PHAs.

"It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (internal quotation marks omitted); *see also United States v. Weiss*, 52 F.4th 546, 549 (3d Cir. 2022) ("Without a controlling statutory definition, those terms take on their 'ordinary, contemporary, common meaning.'"). In common use, the term "owned" means property that the owner holds, possesses, or has legal title to. *See Own, Black's Law Dictionary* (7th ed. 1999) ("To have or possess as property; to have legal title to."); *see also Own, Oxford English Dictionary* (Sept. 2024), https://doi.org/10.1093/OED/5503785849 (last visited Mar. 14, 2025) ("To have or hold as one's own; to have belonging to one, be the proprietor of, possess."). *See generally Da Silva*, 948 F.3d at 635 ("To ascertain the ordinary meaning of words, we refer to standard reference works such as

legal and general dictionaries.") (brackets and internal quotation marks omitted).

Meanwhile, the term "controlled" means that the person or entity with control exercises the power or authority to manage or direct the actions of the property controlled. *See Control*, *Black's Law Dictionary* (7th ed. 1999) ("The direct or indirect power to direct the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee."); *see also Control*, *Oxford English Dictionary* (Dec. 2024), https://doi.org/10.1093/OED/8104960479 (last visited Mar. 14, 2025) ("The fact or power of directing and regulating the actions of people or things; direction, management; command."); *Control*, *Oxford English Dictionary* (Sept. 2024), https://doi.org/10.1093/OED/2166483447 (last visited Mar. 14, 2025) ("To exercise power or authority over; to determine the behaviour or action of, to direct or command; to regulate or govern."). In the context of corporate organizations, "control" of such an organization commonly means the possession of a controlling interest in the organization—that is, less than full ownership of the organization, but with a sufficient ownership stake to control the management or policy

of the organization. *See Control*, *Black's Law Dictionary* (7th ed. 1999) ("To have a controlling interest in."); *see also Controlling interest*, *Black's Law Dictionary* (7th ed. 1999) ("Sufficient ownership of stock in a company to control policy and management; esp., a greater-than-50% ownership interest in an enterprise."); *Controlling interest*, *Oxford English Dictionary* (Sept. 2024), https://doi.org/10.1093/OED/3538803573 (last visited Mar. 14, 2025) ("A stake or holding consisting of the majority of the equity in a business, giving the holder a means of exercising control over the organization's management and policy; the ownership of such a holding by one person or group."). Thus, the ordinary, contemporary, common meaning of the phrase "owned and controlled" in the statute means that PHAs must have both an ownership interest in the insurance entity and a controlling interest in the insurance entity, such that it may control or direct the insurance entity's policy and management. It does not follow, however, that a QPIE must be *exclusively* or *wholly* owned by PHAs, as one may "own and control" an entity with less than a 100% ownership stake.

      This interpretation is further supported by the general-terms canon of statutory construction, which provides "that general terms should be

interpreted generally." *Weiss*, 52 F.4th at 552; *see also Gov't Emps. Ret. Sys. of V.I. v. Gov't of V.I.*, 995 F.3d 66, 107 (3d Cir. 2021) (Matey, J., concurring in part) ("[G]eneral terms are to be accorded their full and fair scope and are not to be arbitrarily limited[.]") (internal quotation marks omitted). HUD's proposed interpretation of "owned and controlled" to mean *exclusively* or wholly owned by PHAs arbitrarily limits the scope of this statutory language, the full and fair scope of which necessarily includes entities controlled by persons with less than a 100% ownership stake.

Moreover, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *see also City & Cnty. of San Francisco v. Env't Prot. Agency*, 604 U.S. \_\_\_, 145 S. Ct. 704, 717 (2025). Thus "[i]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 338 (1994) (internal quotation marks and brackets omitted); *see also United States v. Mobley*, 956 F.2d 450, 452–53 (3d Cir. 1992) ("It is a fundamental canon

of statutory construction that where sections of a statute do not include a specific term used elsewhere in the statute, the drafters did not wish such a requirement to apply."). Looking to other sections of the Housing Act, Congress has proven itself capable of clearly and specifically describing scenarios in which a nonprofit entity is exclusively or wholly owned or controlled by PHAs. *See, e.g.*, 42 U.S.C. § 1437f(o)(11)(B) (defining a dwelling unit owned by a PHA, for purposes of a HUD-sponsored voucher program, as a dwelling unit "in a project that is owned by such agency, by an entity wholly controlled by such agency, or by a limited liability company or limited partnership in which such agency (or an entity wholly controlled by such agency) holds a controlling interest in the managing member or general partner"); 42 U.S.C. § 1437h(a)(1) (referencing "wholly owned Government corporations"); 42 U.S.C. § 1437k(b)(1)(A) (authorizing PHAs to "form and operate wholly owned or controlled subsidiaries (which may be nonprofit corporations) and other affiliates"). Thus, in enacting § 1436c, Congress is presumed to have acted intentionally and purposely in describing a QPIE as "a nonprofit insurance entity owned and controlled by public housing agencies," rather than one "wholly owned and controlled" or "exclusively

owned and controlled" by PHAs.

HUD argues that this court, in interpreting the statutory language of § 1436c, should consider the agency's regulatory interpretation of the statute as set forth in § 965.205(c), which was issued roughly contemporaneously with the statutory language itself and remained consistent over time, as an interpretive aid, entitled to "respectful consideration" by the court—i.e., *Skidmore* deference. *See Loper Bright*, 603 U.S. at 386. We have done so. But with all due respect, while the agency's view has informed our decision, we are not bound by the agency's construction of the statute, and in our examination of the statutory language, we find HUD's interpretation of the statute as requiring QPIEs be owned and controlled *exclusively* by PHAs to be contradicted by the plain and unambiguous language of the statute itself. Moreover, the agency's interpretation of the statutory language "owned and controlled" is not the sort of "factbound determination" based upon HUD's "specialized experience" that is entitled to any special weight in our consideration, but rather a straightforward and pure question of law prime for judicial resolution. *See id.* at 388–89.

HUD also argues that the Housing Act grants the agency a degree

of discretion, citing to the following passage from *Loper Bright*:

> In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion. Congress has often enacted such statutes. For example, some statutes "expressly delegate" to an agency the authority to give meaning to a particular statutory term. Others empower an agency to prescribe rules to "fill up the details" of a statutory scheme, or to regulate subject to limits imposed by a term or phrase that "leaves agencies with flexibility," such as "appropriate" or "reasonable."

*Loper Bright*, 603 U.S. at 394–95 (citations, brackets, and footnotes omitted).

HUD first points to the third paragraph of § 1436c, which provides that:

> in establishing standards for approval of such nonprofit insurance entities, the Secretary shall be assured that such entities have sufficient surplus capital to meet reasonably expected losses, reliable accounting systems, sound actuarial projections, and employees experienced in the insurance industry. The Secretary shall not place restrictions on the investment of funds of any such entity that is regulated by the insurance department of any State that describes the types of investments insurance companies licensed in such State may make. With regard to such entities that are not so regulated, the Secretary shall establish investment guidelines that are comparable to State law regulating the investments of insurance companies.

42 U.S.C. § 1436c. While this statutory language expressly empowers the

agency to exercise its discretion to "fill up the details" with respect to a QPIE's financial and insurance-related controls and practices, it does not confer any authority to promulgate regulations limiting participation in insurance programs administered by QPIEs to PHAs only.

    HUD then points to the general authority to promulgate regulations granted to the Secretary by Congress, arguing that this statutory provision conferred the Secretary with authority to issue regulations imposing this substantive limitation with respect to QPIE eligibility not otherwise articulated in the Housing Act. *See* 42 U.S.C. § 3535(d) ("The Secretary . . . may make such rules and regulations as may be necessary to carry out his functions, powers, and duties."). But, as we have previously noted, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis*, 489 U.S. at 809; *see also San Francisco*, 145 S. Ct. at 717. Thus, "where provisions of a particular law conflict[,] the more particular provisions govern the more general." *N. Border Pipeline Co. v. Jackson Cnty.*, 512 F. Supp. 1261, 1264 (D. Minn. 1981); *see also Ferrell v. U.S. Dep't of Hous. & Urban Dev.*, 186 F.3d 805, 813 (7th Cir. 1999) ("[A] far more reasonable interpretation of the statutory scheme is to conclude

that Congress expected the more particular provision to govern the more general."). Here, the more particular provisions of § 1436c control, rather than the more general provisions of § 3535(d). Moreover, the general language of § 3535(d) does not resemble the sort of clear and unequivocal delegation of such discretionary authority to promulgate rules or regulations in the exemplar statutes identified by the Supreme Court in *Loper Bright*, 603 U.S. at 395 nn.5–6 (citing 29 U.S.C. § 213(a)(15); 42 U.S.C. § 5846(a)(2); 33 U.S.C. § 1312(a); 42 U.S.C. § 7412(n)(1)(A), and *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 20 (1825) (quoting the Judiciary Act of 1789, c. 20, § 17)), nor that identified by the Third Circuit in *Schaffner v. Monsanto Corp.*, 113 F.4th 364, 381 n.9 (3d Cir. 2024) (citing 7 U.S.C. § 136w(a)(1)).

Ultimately, "[i]f the statutory language is unambiguous, our inquiry ends because courts must presume that Congress says in a statute what it means and means in a statute what it says there." *Da Silva*, 948 F.3d at 635 (internal quotation marks omitted); *see also Neto v. Thompson*, 506 F. Supp. 3d 239, 245 (D.N.J. 2020); *cf. Chevron*, 467 U.S. at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at

issue, that intention is the law and must be given effect.").

Accordingly, we find that the HUD regulation limiting participation in QPIE insurance programs to PHAs only, 24 C.F.R. § 965.205(c), exceeds the scope of the authority granted to the agency by the relevant statute it purportedly implements, 42 U.S.C. § 1436c. Thus, we will deny the respondent's motion to dismiss and vacate the ALJ's administrative decision granting summary judgment on Count 2 of the administrative complaint, in which the ALJ found HARIE to be in violation of 24 C.F.R. § 965.205(c) because it did not limit participation in its insurance programs to PHAs only.

In his administrative decision, the ALJ denied summary judgment on Count 1 of the administrative complaint, in which HUD alleged that HARIE was in violation of 42 U.S.C. § 1436c because it was not "owned and controlled" by PHAs. In doing so, the ALJ found that there was a genuine dispute of material fact with respect to whether HARIE was owned and controlled by PHAs, which would have necessitated a trial if summary judgment had not been granted on Count 2.

"A reviewing court has inherent power to remand a matter to the administrative agency. Where the agency has failed to consider

important evidence, the proper course is to remand for reconsideration rather than undertake its own inquiry into the merits." *Loma Linda Univ. v. Schweiker*, 705 F.2d 1123, 1127 (9th Cir. 1983) (citation omitted); *see also Sec'y of Labor of U.S. v. Farino*, 490 F.2d 885, 891 (7th Cir. 1973). The Supreme Court of the United States has provided us with guidance on the exercise of this inherent power. "Generally speaking, a court . . . should remand a case to an agency for decision of a matter that statutes place primarily in agency hands." *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002).

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). This is such a case. On the record before us, which is incomplete, we are unable to resolve the issue of whether HARIE is ineligible for QPIE status because it is not owned and controlled by PHAs.

III. CONCLUSION

For the foregoing reasons, the respondent's motion to dismiss (Doc. 13) will be denied. The decision of the ALJ granting summary judgment in favor of the agency and against HARIE on Count 2 of the administrative complaint will be vacated. The matter will be remanded to the ALJ for further proceedings consistent with this memorandum opinion and order with respect to Count 1 of the administrative complaint. This federal civil action for judicial review will be stayed pending a final determination by the agency with respect to Count 1.

An appropriate order follows.


Dated: March 18, 2025            *s/Joseph F. Saporito, Jr.*
                                 JOSEPH F. SAPORITO, JR.
                                 United States District Judge